## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **HAROLD M. NYANJOM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-1461-JAR** |
| | ) | |
| **HAWKER BEECHCRAFT CORP.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

Plaintiff Harold M. Nyanjom, proceeding *pro se*, filed this case on November 27, 2012, in the United States District Court for the Southern District of New York, alleging claims of discrimination and retaliation under the Americans with Disabilities Act ("ADA") and the Kansas Act Against Discrimination ("KAAD"), against his former employer, Hawker Beechcraft Corp. This case is before the Court on the following motions: Defendant's Motion for Summary Judgment (Doc. 147), Plaintiff's Cross-Motion for Summary Judgment (Doc. 153), Plaintiff's Motion for Leave to File Sur-Reply (Doc. 162), Plaintiff's Amended Motion for Leave to File Sur-Reply (Doc. 163), and Defendant's Motion to Strike Plaintiff's Response to Defendant's Reply to Defendant's Motion for Summary Judgment (Doc. 167). The motions are fully briefed and the Court is prepared to rule. As explained more fully below, after considering both Plaintiff's briefs submitted on the summary judgment motions, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment. The Court grants Plaintiff's Amended Motion for Leave to File Sur-Reply and denies Defendant's motion to strike.

## I.      Procedural History

Plaintiff Harold Nyanjom originally filed this action in the United States District Court for the Southern District of New York because Defendant Hawker Beechcraft Corp. ("HBC") had filed Chapter 11 Bankruptcy in that district.  Finding that venue lies in the District of Kansas, that court transferred this matter on December 11, 2012.  On January 22, 2013, upon the Suggestion of Bankruptcy filed by Defendant, this Court entered an Order staying the case pending resolution of the bankruptcy.  On May 20, 2013, Defendant filed a Bankruptcy Stipulation, approved by the Bankruptcy Court, which modified the Plan Injunction for the limited purpose of permitting Plaintiff to proceed with this litigation so that the value of his claim could be liquidated.  The Stipulation explicitly does not waive any defenses to Plaintiff's claims.[1]  The Court therefore lifted the stay and this case proceeded to discovery.

A dispositive motions deadline was set for November 7, 2014.  The Revised Scheduling Order provides the following directives as to summary judgment motions:

> a.  All potentially dispositive motions (e.g., motions for summary judgment), must be filed by November 7, 2014.  The court plans to decide dispositive motions, to the extent they are timely filed and briefed without any extensions, approximately 60 days before trial.
>
> b.  Compliance with Fed. R. Civ. P. 56 and D. Kan. Rule 56.1 is mandatory, i.e., summary judgment briefs that fail to comply with these rules may be rejected, resulting in summary denial of a motion or consideration of a properly supported motion as uncontested.  Further, the court strongly encourages the parties to explore submission of motions on stipulated facts and agreement resolving legal issues that are not subject to a good faith dispute. The parties should follow the summary-judgment

---

[1]Doc. 29, Ex. 1 ¶2.  This Court is without jurisdiction to decide whether Plaintiff's claims are exempt from the bankruptcy discharge.  Pursuant to the Stipulation, the Plan Injunction was lifted "solely for the limited purpose of permitting the Claimant to . . . liquidate the value of his claim."  *Id.* ¶ 1.

guidelines available on the court's website: [website hyperlink provided].[2]

Defendant sought and received two unopposed extensions of the dispositive motions deadline until November 18, 2014.  On that date, Defendant filed its summary judgment motion, as well as a Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment, as required by this Court's local rule, D. Kan. Rule 56(f).  That notice explained to Plaintiff the summary judgment procedure, and attached the federal and local rules governing summary judgment filings.  Defendant's motion for summary judgment contains 104 numbered statements of material fact, to which it has provided specific citations to the record in support.

Plaintiff sought and was granted one unopposed motion for an extension of time until December 16, 2014, to <u>respond</u> to Defendant's summary judgment motion.  He also sought and was granted leave to exceed the thirty page limit for the argument section of his brief.  On December 16, 2014, Plaintiff filed his response, which he also styled as a Cross-Motion for Summary Judgment.  In this filing, Plaintiff submits sixty-three numbered statements of material fact.  Although they generally respond to various factual averments made in Defendant's motion, they do not correspond to the numbered paragraphs presented by Defendant.  Some of these statements contain a citation to the record; most contain argument.

Defendant was allowed several extensions of time to reply.  Its January 13, 2015 reply is voluminous: 120 pages in length.  This is largely due to the fact that Defendant endeavored to correspond each of Plaintiff's numbered factual averments with Defendant's original numbered factual averments (to which Plaintiff failed to refer), and to provide either a response to each, or a statement as to whether it should be deemed uncontested.  The length of the brief is entirely

---

[2]Doc. 133 ¶ 2.

attributable to Defendant's attempt to aid the Court in determining the uncontroverted facts in this matter, given Plaintiff's failure to follow the local rules and guidelines that had been previously provided to him.

Upon receipt of Defendant's reply memorandum, Plaintiff filed motions for leave to file a sur-reply, which Defendant opposed.  He did not comply with the Court's Local Rule 15.1 that applies when a party seeks leave to file a document that is not permitted under the rules as a matter of course—the proposed document must be attached to the motion for leave in order to allow the Court to determine whether leave should be granted.  Instead, Plaintiff proceeded to file a ninety-three page sur-reply memorandum on February 19, 2015, without prior leave.  The brief attempts to respond to each of the harmonized factual averments provided by Defendant in its reply memorandum, and to address the arguments raised in the reply.  Defendant promptly moved to strike this document from the record.

## II.    Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[3]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[5]  A fact is "material" if, under

---

[3]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[4]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[5]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  An issue

of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the

non-moving party.'"[7]

The moving party initially must show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.[8]  In attempting to meet this standard, a movant that

does not bear the ultimate burden of persuasion at trial need not negate the other party's claim;

rather, the movant need simply point out to the court a lack of evidence for the other party on an

essential element of that party's claim.[9]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

"set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[12] When the moving party also bears the

---

[6]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[9]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[10]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[11]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[12]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

burden of proof at trial,

> a more stringent summary judgment standard applies. Thus, if the
> moving party bears the burden of proof, to obtain summary
> judgment, it cannot force the nonmoving party to come forward
> with "specific facts showing there [is] a genuine issue for trial"
> merely by pointing to parts of the record that it believes illustrate
> the absence of a genuine issue of material fact. Instead, the moving
> party must establish, as a matter of law, all essential elements of
> the issue before the nonmoving party can be obligated to bring
> forward any specific facts alleged to rebut the movant's case.[13]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a
specific exhibit incorporated therein."[14]   Rule 56(c)(4) provides that opposing affidavits must be
made on personal knowledge and shall set forth such facts as would be admissible in evidence.[15]
The non-moving party cannot avoid summary judgment by repeating conclusory opinions,
allegations unsupported by specific facts, or speculation.[16]

"Where, as here, the parties file cross motions for summary judgment, [the Court is]
entitled to assume that no evidence needs to be considered other than that filed by the parties, but
summary judgment is nevertheless inappropriate if disputes remain as to material facts."[17]   Cross
motions should be considered separately.[18]   Just because the Court denies one does not require

---

[13]*Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted).

[14]*Adams*, 233 F.3d at 1246.

[15]Fed. R. Civ. P. 56(c)(4).

[16]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[17]*James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[18]*Ultra Clean Holdings, Inc. v. TFG-Cal., L.P.*, 534 F. App'x 776, 780 (10th Cir. 2013) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

that it grant the other.[19]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[20]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[21]

Because Plaintiff proceeds *pro se*, some additional considerations frame the Court's analysis.  The court must construe his pleadings liberally and apply a less stringent standard than that which is applicable to attorneys.[22]  However, the court may not provide additional factual allegations "to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[23]  Additionally, a *pro se* litigant is not excused from complying with the rules of the court and is subject to the consequences of noncompliance.[24]

## III.   Technical Defects with Plaintiff's Filings

Defendant first argues that Plaintiff's cross-motion for summary judgment is untimely and should be denied on this basis alone.  The Court agrees that Plaintiff's motion is untimely;

---

[19]*Id.*

[20]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[21]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[22]*Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir. 1997).

[23]*Id.*

[24]*Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994) (citing *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (insisting that pro se litigants follow procedural rules and citing various cases dismissing pro se cases for failure to comply with the rules)).

the dispositive motions deadline was November 18, 2014, yet Plaintiff filed his motion on December 16, as part of his response to Defendant's motion.  Plaintiff suggests that the Court granted his motion to extend the deadline, but his motion for extension of time did not request an extension of the dispositive motions deadline.  The Order therefore only allowed Plaintiff additional time to respond to Defendant's motion.  Nonetheless, as explained fully below, the Court has reviewed Defendant's filing and finds that even if it was timely, it must be denied on the merits.

Defendant also opposes Plaintiff's attempt to file a sur-reply to the motion.  Again, Defendant is correct that Plaintiff failed to follow the proper procedures in seeking leave to file the sur-reply, and that the sur-reply was improperly filed without prior leave of Court.  The Court is also mindful of the herculean effort expended by Defendant in attempting to synthesize the factual averments in its reply brief.  However, given Plaintiff's status as a *pro se* litigant, the Court must construe Plaintiff's filings more liberally than those of a licensed attorney.  To that end, the Court will consider Plaintiff's brief, despite his failure to follow the rules of procedure. Nonetheless, as described more fully below, the Court finds that Defendant has shown that no reasonable jury could find in favor of Plaintiff on his claims of discrimination or retaliation under the ADA and KAAD.

## IV.    Uncontroverted Facts

Plaintiff failed to follow the federal and local rules in his summary judgment briefing, despite being provided with notice of the Court's rules and guidelines both in the Scheduling Order, and by Defendant under D. Kan. Rule 56.1(f).  Plaintiff's failure to follow the local rule on presenting his factual matter on summary judgment is particularly problematic in this case

given the voluminous factual record, and the sheer amount of factual recitations in the briefs. Despite Defendant's best efforts, the Court has expended significant effort in order to reconcile the 167 statements of fact presented by these parties. While the Court construes Plaintiff's briefs liberally, the Court must deem admitted those facts to which Plaintiff wholly failed to respond or otherwise controvert with record evidence that could be presented in an admissible form at trial. Moreover, to the extent Plaintiff purports to controvert facts without specifically citing to appropriate factual material in the record, those facts will be deemed admitted as well. Finally, the Court disregards legal argument presented by either party in their statements of fact, and only considers those facts that are material to issues raised in the motions.

The following material facts are uncontroverted or stipulated to for purposes of summary judgment. Plaintiff Harold Nyanjom was hired by Defendant's predecessor company on January 22, 1999, and was classified as a Sheet Metal Assembler in Department 651, Job Code 021, Labor Grade 6. The job description for a sheet metal assembler at HBC provides:

> This occupation requires the assembling and/or installation of component parts, and large and small assemblies to conform to blueprint specifications. May involve work on parts or assemblies on several models of aircraft, all within a given work period. Assumes full responsibility for all job assignments handled.[25]

The job description provides a list of operations that are typical of those required to be performed, including drilling, creating various aircraft assemblies, and using a variety of tools such as a drill, rivet gun, rivet hammer, countersink, and measuring device. Throughout his employment, plaintiff was an employee at will.

Plaintiff has a congenital vision deficiency which was known to HBC when it hired

---

[25]Doc. 147-15, Ex. 14 at 2.

Plaintiff in 1999.  He has been virtually blind in his left eye since birth, and is only able to perceive light in that eye.  The vision in his right eye is reduced, but is correctable with eye glasses to 20/20.  Plaintiff's vision deficiency does not affect his ability to hear, speak, breathe, learn, stand, sit, bend, communicate, lift, reach, sleep, eat, think, or concentrate.  His visual impairment does impact his ability to read; he either reads large-print materials or holds printed material close to his face.

### *Collective Bargaining Agreement*

Since 1939, the  International Association of Machinists and Aerospace Workers ("IAM") has represented a sizeable portion of the hourly-compensated workers employed by Defendant. At all times material, Defendant was a party to a collective bargaining agreement with the IAM that became effective on August 4, 2008 and expired on August 7, 2011.  The terms of that agreement define the company's obligations with regard to employees within the bargaining unit, including pay, benefits, work hours, rest periods, overtime pay, recalls, seniority, promotions, grievances, discipline, and job transfers.  At all times throughout his employment, Plaintiff was assigned to jobs that were governed by the collective bargaining agreement.  The collective bargaining agreement provided that when there is a reduction in force or layoff, employees in the affected department with less seniority are the ones laid off or reduced, while the more senior employees are retained.

Under the agreement:

> When employees are laid off from their present department and exercise
> their seniority to return to their intermediate or home department in
> accordance with this Section, they will administratively be placed on the
> shift that they held at the time they left their intermediate or home

department.  The returning employees will then utilize their seniority for purposes of shift preference.[26]

An employee who is laid off from his current department may exercise their seniority in prior departments and "bump" out less senior employees there.  Plaintiff's seniority date is January 22, 1999.

The collective bargaining agreement also includes provisions on Occupational Safety and Health.  It requires employees to wear goggles when assigned to "operations involving eye hazards."  "If in doubt, wear goggles.  This safety equipment is furnished free of charge by the Company and can be obtained from the tool crib."[27]  Defendant provides safety goggles that meet the American National Standards Institute standard for high impact-resistant eye protection.  All employees and visitors on the shop floor are required to wear this safety equipment.

### *Plaintiff's Job Classification History*

Plaintiff worked as a Sheet Metal Assembler from his hire date on January 22, 1999 until March 25, 2002.  During this time, he progressed from a Labor Grade 8 to 5.  He was then reclassified as a CNC Rivet Machine Operator and worked in that position until June 2, 2003, when he was reclassified back to a Sheet Metal Assembler until January 1, 2007, in Department 655.  During this time period, Plaintiff primarily wrote tags identifying nonconforming parts.  On January 1, 2007, Plaintiff was reclassified as an Assembly Inspector and worked as either an Assembly Inspector or Conformity Inspector until November 2009.  This was a lateral transfer for which Plaintiff had applied.  As an assembly inspector, Plaintiff continued his work tag writing, as that task was absorbed by the inspection department.

---

[26]Doc. 147-5, Ex. 4 ¶ 5.06.03(B).

[27]*Id.* at 64 ¶ 19.08.09.

11

The aviation industry suffered a substantial downturn due to economic factors beginning in 2008.  As a result, there were a series of reductions in force ("RIFs"), which eventually caused thousands of HBC employees to lose their jobs.  Defendant closed its facilities in Salina, Kansas and Little Rock, Arkansas.  Plaintiff was generally aware of the downturn in the industry, and received letters from management informing employees that there were likely to be layoffs.

On November 10, 2008, there was a layoff that Plaintiff survived because he was "bumped" instead of laid off.  He transferred back to an Assembly Inspector position in Department 378.  Plaintiff worked as an Assembly Inspector until November 30, 2009, when he was again bumped instead of laid off; he had rights to bump back to Department 655 as a Sheet Metal Assembler.  He performed all of the traditional duties of a Sheet Metal Assembler until May 3, 2010.  He worked during this time in the Government Business building, one of the newer buildings at the facility.  Plaintiff testified in his deposition that during this time he requested accommodations to protect his eyes, meeting with his team leader Pete Senecal, his supervisor, William Cotman, and IAM representative Steve Reist.  He requested extra lighting, magnification devices, large print, magnification on the computers he used, and an assistant.  In terms of lighting, Plaintiff specifically requested more freestanding lamps and better overhead lighting.

Defendant provided Plaintiff with various protective eyewear, including oversized goggles and a visor, and although he testified that he was unaware of any other protective eyewear that would work better than the polycarbonate lenses with side shields that he had been wearing, he stated that he believed those lenses were inadequate to protect his eyes.

Plaintiff applied for Social Security disability benefits in February 2010, on the basis of

his vision impairment.  The Social Security Administration ("SSA") denied Plaintiff's application, noting that he was working every day.  Plaintiff believed that he could work part-time and collect Social Security benefits, although he never applied for a part-time position and admits he misunderstood the rules about employment in relation to obtaining Social Security benefits.

### Communications with Plaintiff's Optometrist

On March 17, 2010, Plaintiff wrote his optometrist, Dr. Amy Goertz, stating that he worked in sheet metal assembly, and that

> my employer has requested that you please provide a list of restrictions so that they may evaluate my case as a disabled employee: 1.  Current diagnosis, treatment and outcomes.  2.  Current registration as a permanently disabled citizen.  If you don't mind, I would like to schedule an appointment with you . . . to discuss the issue.[28]

Previously, Dr. W. Chris Arensberg, Dr. Goertz's partner, wrote a letter "To Whom it May Concern" on Plaintiff's behalf, stating that he had examined Plaintiff on March 5, and that Plaintiff's best corrected vision is 20/20 in the right eye.  He stated further that "[a] vitreous detachment is causing his chief complaint of floaters.  There is no treatment for this."[29]

On April 19, 2010, Plaintiff again wrote to Dr. Goertz.  He described his job as a "sheet metal mechanic," and continued:

> 1. Dr. Arensberg confirmed my diagnosis of Vitreous Detachment (of which is progressively worsening), with the grim outlook of Retinal Detachment and no treatment in the Right eye and blindness in the Left eye.
> 2. I am currently registered with [sic] as a permanently disabled person.

---

[28]Doc. 147-17, Ex. 16.

[29]Doc. 147-18, Ex. 17.

> Due to the fact that I am deeply concerned that my deteriorating visual
> impairment poses a serious and increasing risk to my safety at work, in
> work performance and to Hawkerbeechcraft Co., as you review the noted
> information, I would like to kindly request you to draft documentation
> indicating your determination that I am unable to work and/ or function
> within the workforce.  I'm at a point where I need to make a serious
> decision since my options are severely limited and an increasing potential
> of ending up completely blind strongly exists.  However, I am even
> considering being open to any surgical options for treatment to save my
> sight.  In order to evaluate my case as a disabled employee, my employer
> has requested that you please review all the above information and
> provide documentation indicating my inability to work and/or even
> possibly a listing of restrictions to support this fact.[30]

On May 3, 2010, Plaintiff was transferred to Department 160 as a Conformity Inspector,

working in Quality Assurance; he had applied for the position.

On May 7, 2010, Dr. Goertz wrote a letter "To Whom it May Concern," stating the

following about Plaintiff's work limitations:

> Working as a sheet metal mechanic is a safety concern for Harold.
> Especially when he is drilling sheet metal, there is a risk for an injury to
> his eyes.  If Harold were to injure his good eye, he could be left without
> vision.  Therefore, I do not recommend that he perform tasks that put him
> at risk to damage his eyes.[31]

On May 14, 2010, Plaintiff visited Dr. Goertz's office and told a staff member that the

list of limitations in the May 7 letter was too generalized.  He asked Dr. Goertz to "specify that

he cannot do sheet metal period & then include a list of things he can't do."  Dr. Goertz's notes

indicate that the staff member "marked the 'jobs' he can't do on his job description.  I called pt

today, but no one answers his phone."[32]  Dr. Goertz's notes further indicate that she spoke with

---

[30]Doc. 147-19, Ex. 18.

[31]Doc. 147-13, Ex. 12.

[32]Doc. 147-20, Ex. 19.

14

Plaintiff on May 19 and he told her that he would be placed in an administrative position or some other position if he received the requested letter from her and urged her to contact his employer. On May 21, Dr. Goertz spoke with Plaintiff's supervisor Renee Cooper, who stated she had not received previous letters from Dr. Goertz and that she did not know why Plaintiff needed them because she did not oversee the sheet metal department.

On June 2, 2010, Plaintiff wrote to Dr. Goertz that he wanted to exit the workforce and pursue disability benefits, which they had previously discussed. Plaintiff asked her to contact the medical administrator at HBC.

On July 16, 2010, Dr. Goertz's notes indicate that Plaintiff contacted her and again asked for a letter giving the specifics of what he can't do, "or stating that he 'can't do sheet metal.'" Dr. Goertz told Plaintiff, "I can't write a letter stating he can't do something that he is capable of. He has worked in sheet metal in the past & has a good performance record. I told him I had written several letters stating his visual status. . . . They need to figure out what he can & can't do."[33]

Plaintiff again requested a letter from Dr. Goertz on August 27, 2010, asking her to review a list of specific tasks required for sheet metal assembly, and recommend "that these specific tasks cannot be performed for safety reasons."[34] Dr. Goertz contacted Plaintiff and declined to write the requested letter. She recommended that he meet with an occupational therapist.

There was a RIF in August 2010. Because Plaintiff lacked seniority as a Conformity

---

[33]Doc. 147-22, Ex. 21.

[34]Doc. 147-23, Ex. 22.

Inspector, he was selected for layoff.  He had "bump" rights as a Sheet Metal Assembler, which he could and did exercise on August 30, 2010.  At this time, Plaintiff requested various accommodations.

### Requested Accommodations

Plaintiff requested revising the overhead lighting in the Government Business plant, which was denied.  Plaintiff had access to freestanding lamps that were available to plant employees, and he moved them over to his work area.  Plaintiff requested that each of the blueprints he would use be converted to large print and for Defendant to give him step-by-step assembly procedures in large print for each part built, with pictures of the part showing each step of the process.  The company began the process of putting such books together with Plaintiff's help, but it was not completed.

Plaintiff requested that HBC provide him with a trainer to watch over and train him as he did sheet metal assembly, to be sure he did not damage the aircraft.  Defendant provided an experienced sheet metal assembler to work with Plaintiff on the wing assembly of the military aircraft he was working on.

Plaintiff requested an occupational therapist from Envision evaluate his work area.  Because there were Department of Defense security requirements that applied to the Government Business building, an outside occupational therapist was not allowed to observe Plaintiff's workspace.  Plaintiff's supervisor, William Cotman, told him that they would have the company's ergonomist do an evaluation instead.

### Medical Leave

HBC provided a short term disability plan to its employees with no contribution toward

16

the premium required to be paid by the employee.  HB also provided its employees with a long term disability plan, at the employees' expense.  Plaintiff applied for short term disability benefits some time prior to September 17, 2010, and was approved, effective September 22, 2010.  Although HBC was unaware at the time, Dr. Goertz completed a Medical Request Form as part of Plaintiff's short term disability claim.  She stated that as of that date, September 24, 2010, Plaintiff could return to work if accommodations were made for him.  She listed one restriction for Plaintiff at home and at work: polycarbonate glasses.  The eyeglasses routinely worn by Plaintiff had polycarbonate lenses.

HBC notified Plaintiff in writing that because of his "incapacity, we have placed you on a medical Leave of Absence effective 09/15/2010 consistent with company policy.  Your leave will expire on 09/15/11 at which time you must return to work or on the date your treating physician releases you, whichever occurs first."[35]  On September 14, 2010, Plaintiff applied for Supplemental Security Income ("SSI") disability benefits.  During the application process, he represented that he had become unable to work because of a disability on September 14, 2010.  Plaintiff believed that he qualified for these benefits because Defendant had placed him on involuntary medical leave.  Plaintiff's application was denied because his spouse possessed more than the allowed amount of assets.

On October 2, 2010, Plaintiff applied for unemployment benefits through the Kansas Department of Labor.  He contended that he was eligible for benefits because of his involuntary medical leave.

On February 6, 2011, Plaintiff was notified by the SSA that he was entitled to monthly

---

[35]Doc. 148-2, Ex. 24.

disability benefits beginning in March 2011.

Plaintiff dual-filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") and the  Kansas Human Rights Commission ("KHRC") on February 15, 2011.  He alleged that he was discriminated against, denied reasonable accommodation for his disability, subjected to involuntary transfers, subjected to an involuntary medical leave of absence, denied long term disability benefits, not rehired, and that he was retaliated against "for opposing acts and practices forbidden by the Kansas Act Against Discrimination."[36]  Plaintiff further alleged that other employees with similar or less experience were transferred to management positions or positions that would have accommodated his disability.

On May 30, 2011, Plaintiff applied for disability retirement benefits with HBC Pension Plans.  To be entitled to such benefits, Plaintiff was required to affirm that he is

> disabled as a result of sickness, accident, ill health or other physical or mental causes which prevents me from performing and discharging the duties of suitable employment; [he has] incurred a disability during active employment while an employee at the [HBC], and this situation is considered permanent and continuous for the remainder of my life.[37]

Plaintiff stated in his deposition that he first became aware of discrimination on the basis of his disability in November 2009, after he requested accommodation.  At that time, he did not report discrimination to Human Resources and he did not file a formal grievance with the union. He claims that he was retaliated against by his supervisor when he was harassed about his presence after his shift while waiting for transportation, and when he was subjected to intimidating meetings.  Later in his deposition, he contended that he became aware of

---

[36]Doc. 148, Ex. 36.

[37]Doc. 148, Ex. 39.

discrimination in August 2010 when he asked for accommodations.  Defendant's equal

opportunity policy directs employees who believe that they have been the victim of

discrimination or harassment to promptly make a report to Human Resources, or lodge a

complaint with the Ethics Office.  He did not file such a complaint.

### *Disability Retirement*

Plaintiff was employed by Defendant until June 1, 2011, when he applied for and

received disability retirement benefits from HBC.  He was notified that he was entitled to receive

disability retirement benefits, retroactive to June 1, 2011, and continuing through his normal

retirement date of August 1, 2033.  To continue to receive these benefits, Plaintiff must remain

totally and permanently disabled.  He is required to submit evidence, up to twice per year, that he

continues to be eligible to receive Social Security Disability benefits.  Plaintiff has continued to

receive the HBC disability retirement benefits to the present date.  On June 21, 2011, Cotman

completed a Termination Transaction Request Form for Plaintiff, stating a separation date of

June 1, 2011, and stating the reason as "Retired."

Plaintiff filed a Supplement to Existing Charge with the KHRC on August 11, 2011.  He

stated in this supplement that he was discriminated and/or retaliated against in connection with

his application for a Technical Specialist position at HBC.  Specifically, he alleges that a

February 16, 2011 interview for this position had been canceled after the selection coordinator

learned of Plaintiff's disability and medical leave status.  None of the applicants for the

Technical Specialist position were hired, however, because HBC learned that a previously laid

off worker had performed the job and was working for HBC as a contractor.  HBC hired this

worker with previous experience and cancelled all scheduled interviews for the position.

Plaintiff dual filed another administrative complaint with the KHRC and EEOC on September 20, 2011.  The complaint alleges retaliation only.  Plaintiff did not mark the box for disability discrimination.  Plaintiff alleged retaliation based on his involuntary retirement and complained that he should have been provided with disability benefits prior to March 31, 2011.  In response to this complaint, Defendant offered to have its third-party administrator rescind the retirement disability benefit if Plaintiff did not wish to proceed with those benefits, but Plaintiff declined the offer.

HBC filed its bankruptcy petition on May 3, 2012.

On August 27, 2012, the KHRC completed its investigation into Plaintiff's complaint and determined that there was probable cause to credit his allegations.  The KHRC issued an eight-page case summary report of its findings.  The KHRC found "evidence Complainant was discriminated against due to his disability, was denied reasonable accommodations, was not offered alternative jobs that were available within the sheet metal department, where he was last bumped."[38]  On October 19, 2012, the EEOC issued its determination "that there is reasonable cause to believe that a violation of the law has occurred," indicating it gave great weight to the KHRC decision [39]  The agency indicated it would begin conciliation efforts.

V.     Discussion

Defendant moves for summary judgment on the following grounds: (1) Plaintiff's claims must be dismissed for failure to timely exhaust as to conduct that occurred prior to April 21, 2010; (2) Plaintiff's claims of discrimination on the basis of his disability fail because there is no

---

[38]Doc. 153-6, Ex. 5 at 9.

[39]Doc. 153-3, Ex. 2.

evidence that he was qualified, with or without reasonable accommodation, to perform the essential functions of his job, or that he was discharged because of his disability; and (3) Plaintiff's retaliation claims fail because he was not subjected to an adverse employment action, and because he cannot show a causal connection between his protected activity and being placed on disability retirement.

Plaintiff argues not just that there are genuine issues of material fact as to his claims of discrimination and retaliation, but goes further and argues that he is entitled to summary judgment on his claims. Plaintiff contends that the EEOC and KHRC determinations are sufficient to prove the elements of his claims against Defendant, and to exempt his claims from corporate bankruptcy discharge because they establish that the discrimination and retaliation was willful.

Plaintiff's claims rely on circumstantial evidence.[40] The Court analyzes ADA discrimination and retaliation claims that are based on circumstantial evidence under the *McDonnell-Douglas Corp. v. Green*[41] burden shifting framework.[42] This analysis proceeds in three steps: "(1) the plaintiff must establish a prima facie case of discrimination or retaliation; (2) the defendant employer must offer a legitimate non-discriminatory reason for the adverse employment action; and (3) the plaintiff must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual."[43]   Under

---

[40]*See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (discussing the difference between direct and circumstantial evidence).

[41]411 U.S. 792 (1973).

[42]*See, e.g.*, *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014).

[43]*Id.* (citation omitted).

*McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination or retaliation.[44]  The burden of establishing the prima facie case is "not onerous."[45]  If Plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[46]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[47]

The Court will first address Plaintiff's administrative claims—their timeliness and their evidentiary value.  The Court next addresses the merits of Plaintiff's claims of discrimination and retaliation.[48]

### A.    Administrative Decisions

### 1.    Timely Exhaustion

The ADA requires claims to be exhausted administratively.[49]  Although administrative exhaustion is jurisdictional, "filing a <u>timely</u> charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of

---

[44]*McDonnell Douglas*, 411 U.S. at 802.

[45]*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 238, 253 (1981).

[46]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[47]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[48]The standards under the ADA and KAAD claims are essentially the same.  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n.3 (10th Cir. 1997).  Therefore, the Court's analyses as to the merits of Plaintiff's claims under the ADA apply equally to his claims of discrimination and retaliation under the KAAD.

[49]*Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1309 (10th Cir. 2005).

limitations, is subject to waiver, estoppel, and equitable tolling."[50]  A plaintiff's allegation is timely if he files his EEOC charge within 300 days of the alleged unlawful employment practice.[51]

Defendant moves to dismiss Plaintiff's disability discrimination claims on the basis that certain alleged conduct was not timely exhausted because it occurred more than 300 days before he filed his first administrative charge on February 15, 2011.  He filed subsequent charges in August and September 2011.   Defendant thus raises the affirmative defense of failure to timely exhaust administrative remedies.[52]  Defendant has the burden of proof on the affirmative defense, and in moving for summary judgment, "[t]he defendant . . . must demonstrate that no disputed material fact exists regarding the affirmative defense asserted."[53]  Once the defendant makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact."[54]  If the plaintiff cannot meet this burden, "the affirmative defense bars [his] claim, and the defendant is then entitled to summary judgment as a matter of law."[55]

The Court agrees that Plaintiff has failed to exhaust his claims with regard to discrimination that predated April 21, 2010, 300 days before he filed his first administrative complaint.  And regardless of whether Plaintiff's retaliation claims are measured from the first or last administrative filing, Plaintiff's retaliation claims stemming from his request for

---

[50]*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (emphasis added).

[51]*Semsroth v. City of Wichita*, 304 F. App'x 707, 714 (10th Cir. 2008).

[52]*Jones v. Runyon*, 91 F.3d 1398, 1399 n.1 (10th Cir. 1996).

[53]*Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir.1997).

[54]*Id.*

[55]*Id.*

accommodation in November 2009 are time barred.  All other conduct alleged by Plaintiff appears to have accrued after April 21, 2010 and was thus timely exhausted.  Although Plaintiff testified in his deposition that he first suspected that he was being discriminated against on the basis of his visual impairment in November 2009, he also testified that he requested accommodations in August 2010, well within the 300-day period of exhaustion.

Plaintiff argues that had his complaint been untimely, the administrative agencies would have notified him as such.  But this is not the test, and as described below, the Court views Plaintiff's claims de novo and would not be bound by any KHRC ruling on timeliness.

Plaintiff suggests that equitable tolling should apply.  The parties both recognize that equitable tolling may excuse an untimely filing "when a plaintiff is actively misled or prevented from asserting his rights."[56]  Construing the evidence in the light most favorable to Plaintiff, there is no indication in the record that he was actively misled or prevented from asserting his rights under the ADA.  And Plaintiff's argument that he could not exhaust due to his medical leave of absence is also unavailing.  His medical leave of absence was in September 2010, more than nine months after he testified he first suspected discrimination in November 2009.  And Plaintiff provides no explanation as to why his medical leave of absence would have prevented him from filing an administrative complaint.  Accordingly, the Court dismisses any claims that accrued prior to April 21, 2010.

## 2.    Evidentiary Value of Administrative Decisions

The parties also dispute the evidentiary value of the determinations made by the KHRC and EEOC that there is probable cause or reasonable cause to believe that a violation of the law

---

[56]*Harms v. I.R.S.*, 321 F.3d 1001, 1006 (10th Cir. 2003).

occurred.[57]  Plaintiff urges that the KHRC findings require this Court to enter summary judgment

in his favor, while Defendant urges that the Court must review the record de novo, and that the

administrative decisions constitute inadmissible hearsay that should be excluded from the

summary judgment record.  First, Plaintiff's suggestion that the KHRC or EEOC agency findings

suffice to prove his claims in this case is incorrect.  The United States Supreme Court has held

that unreviewed state administrative proceedings have no preclusive effect on a Title VII

discrimination lawsuit.[58]  Moreover, the KHRC findings are not admissible absent proof of an

adequately developed administrative record that establishes the trustworthiness and reliability of

the decision.[59]  No such proof has been submitted on summary judgment.  And finally, the Tenth

Circuit has counseled that when the evidence presented on summary judgment "fail[s] to

establish a genuine issue of material fact, a favorable EEOC letter of determination does not

create one."[60]  Thus, the Court will proceed to consider the independent evidence presented by

the parties to determine whether a genuine issue of material fact exists.  If it does not, the KHRC

and EEOC determinations will not create one.

### B.    Disability Discrimination Claims

The ADA prohibits covered employers from discriminating against "a qualified

---

[57]Doc. 153-5, Ex. 5; Doc. 153-3, Ex. 2.

[58]*Univ. of Tenn. v. Elliott*, 478 U.S. 788, 795–96 (1986).

[59]*See Hamwi v. Den-Tex Cent., Inc.*, No. 08-4151-SAC, 2010 WL 3878865, at *2–3 (D. Kan. Sept. 28, 2010) (citing *Denny v. Hutchison Sales Corp.*, 649 F.2d 816, 821 (10th Cir.1981)).

[60]*Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1331 (10th Cir.1999), *abrogated in part on other grounds by Eisenhower v. Weber Cnty.*, 744 F.3d 1220, 1227 (10th Cir. 2014); *accord White v. Oklahoma*, 552 F. App'x 840, 848–49 (10th Cir. 2014).

individual on the basis of disability."[61]  Plaintiff alleges that HBC discriminated against him on the basis of his disability when he was denied reasonable accommodations, was not offered alternative jobs that were available, and when it caused him to involuntarily retire.  In order to establish a prima facie case of discrimination under the ADA, Plaintiff must show that: (1) he is disabled, as defined by the ADA; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) he suffered discrimination as a result of his disability.[62]  Defendant does not contest that Plaintiff was disabled.  But it argues that there is no genuine issue of material fact that Plaintiff was not qualified to perform the essential function of his job with or without reasonable accommodation.  Defendant further argues that there is no evidence he was discharged because of his disability, or that he was not hired for an alternate position because of his disability.

### 1.    Failure to Accommodate

Plaintiff must establish that he is qualified to perform the essential function of his job, with or without accommodation, and this issue is a mixed question of law and fact.[63]  It is a two-part inquiry: (1) the Court must determine whether Plaintiff can perform the essential functions of the job; and (2) if he is unable to perform the essential functions of his job, whether any reasonable accommodation by the employer would enable him to perform those functions.[64]

---

[61]42 U.S.C. § 12112(a).

[62]*Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 742 (10th Cir. 2013).

[63]*Id.*

[64]*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 887–88 (10th Cir. 2015).

"A job function is 'essential' if it is fundamental to a position and all employees in the position must perform it.'"[65]  Under the statute, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."[66]  The EEOC has developed regulations that define "essential functions," and the Tenth Circuit has "explicitly incorporate[d] the EEOC's regulations" into its disability discrimination jurisprudence.[67]  The EEOC's definition provides:

> (1) In general.  The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.
>
> . . . .
> (3) Evidence of whether a particular function is essential includes, but is not limited to:
>
> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.[68]

Although the employer's judgment is not conclusive evidence of the essential functions of a

---

[65] *Koessel*, 717 F.3d at 743 (citing *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009)).

[66] 42 U.S.C. § 12111(8).

[67] *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 884 (10th Cir. 2015).

[68] 29 C.F.R. § 1630.2(n).

position, it weighs heavily in the determination.[69]

The job descriptions for the various grade levels of sheet metal assemblers provides strong evidence that cutting, drilling, and conforming sheet metal is an essential part of the job. The job requires creating various aircraft assemblies, and using a variety of tools such as a drill, rivet gun, rivet hammer, countersink, and measuring device.  Plaintiff does not contest that these are essential functions of the sheet metal assembler position.  Plaintiff determined in August 2010 that he could not perform the essential functions of his job.  Indeed, in 2010, he repeatedly requested documentation from Dr. Goertz that would establish his inability to perform the essential functions of a sheet metal assembler.

Plaintiff applied for Social Security Disability benefits two times in 2010, affirming that he was unable to work.  The second time, he alleged a disability onset date of September 14, 2010, which was accepted by the SSA.  He stated in his September application that he was unable to work.  Likewise, in 2011, Plaintiff applied for disability retirement benefits and affirmed that he was disabled and could not perform the duties of suitable employment.  He stated it was a permanent situation and would continue for the remainder of his life.  These representations are entirely inconsistent with any claim in this case that he was able to perform the essential functions of the sheet metal assembler job.

While Plaintiff is correct that a Social Security claim and an ADA claim are not always mutually exclusive, the Supreme Court has made clear that "a plaintiff's sworn assertion in an application for disability benefits that []he is, for example, 'unable to work' will appear to negate

---

[69]*Hawkins*, 778 F.3d at 889.

an essential element of [his] ADA case—at least if []he does not offer a sufficient explanation."[70] The Court explained: "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'"[71]  Plaintiff argues that HBC has not provided this Court with a copy of a document signed by him that states he is unable to work and merely relies on the fact that he received Social Security and retirement benefits.  But this is not accurate.  Defendant submitted Plaintiff's September 17, 2010 Social Security application, as well as his disability retirement application, both of which state that he is unable to work. Plaintiff also argues that he believed he could qualify for certain Social Security benefits available to persons who are blind while working part-time.  But as described below, Plaintiff cannot show that he could have performed his job with reasonable accommodations, nor is there any evidence in the record that part time work was an option for him at HBC.

Plaintiff argues that he was capable of performing the sheet metal assembly tasks with reasonable accommodation.  Plaintiff bears the burden of establishing the existence of a facially reasonable accommodation.[72]  If Plaintiff is able to demonstrate the existence of a facially reasonable accommodation, the burden then shifts to Defendant "to show its inability to provide the requested accommodation."[73]  Under the statute,

---

[70]*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806–07 (1999).

[71]*Id.* at 807.

[72]*Hennagir*, 587 F.3d at 1264.

[73]*Id.*

> The term "reasonable accommodation" may include—
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.[74]

Plaintiff requested the following accommodations when he was bumped back to the sheet metal assembler position in 2010: have an occupational therapist perform an assessment of Plaintiff's work area, reassign him to another position, provide better overhead lighting, provide instructional manuals and large-print blueprints, and provide him with an experienced trainer for certain parts of the aircraft assembly.  The Court finds that Plaintiff has fulfilled his burden of establishing a facially reasonable accommodation as to the trainer, adding extra lamps to his work area, and providing large-print pictures and instructional manuals.[75]  The uncontroverted facts establish that Defendant accommodated each of these requests.  Therefore, the Court must determine whether Plaintiff's requests for an outside occupational therapist evaluation, reassignment to administrative tasks, or providing better overhead lighting were facially reasonable requests.

Plaintiff asked HBC to revise the overhead lighting in the Government Business Building, which was denied.  Plaintiff had access to freestanding lamps that were available to plant employees, and he moved them over to his work area.  The Government Business Building was one of the newer buildings at Defendant's facility.  While a reasonable jury could find that

---

[74]42 U.S.C. § 12111(9).

[75]Although the picture-based instructional manual was not completed before Plaintiff stopped working at HBC, the company had been working with him to develop these manuals prior to his departure.

better lighting is certainly a reasonable request, the Court agrees no reasonable jury could find that revising all overhead lighting in the plant was a reasonable accommodation.  And even if Plaintiff fulfilled his burden of demonstrating that this is a facially reasonable request, Defendant has come forward with uncontroverted evidence that it could not provide this accommodation given the cost.  "The regulations do not mandate a reasonable accommodation which requires 'undue hardship' after a consideration of cost, financial resources, and the operation of the entity."[76]  Defendant has established that the aviation industry suffered a substantial downturn due to economic factors beginning in 2008, and that as a result, there were a series of RIFs which eventually caused thousands of HBC employees to lose their jobs.  Indeed, one such RIF immediately preceded Plaintiff's request for this accommodation and was the cause of Plaintiff bumping back to the sheet metal assembly department where he had seniority rights.  In light of this evidence, Defendant has met its burden of showing that it could not revise the overhead lighting system in this newer plant given the cost and financial resources of Defendant at that time.

Plaintiff also requested that an occupational therapist from Envision, an external company, evaluate his work station and suggest improvements or accommodations.  Assuming that an evaluation by an occupational therapist is a facially reasonable request, Defendant has met its burden of demonstrating its inability to retain an outside occupational therapist to evaluate Plaintiff's workstation in the Government Business building.  Instead, HBC arranged for a company ergonomist to evaluate Plaintiff's workstation.  Plaintiff fails to provide any evidence that the outside occupational therapist was necessary as compared to the internal

---

[76]*Umholtz v. Kan. Dep't of Soc. & Rehab. Servs.*, 926 F. Supp. 2d 1222, 1233 (D. Kan. 2013) (citing 29 C.F.R. § 1630.2(p)).

ergonomist that Cotman agreed to provide.

Plaintiff suggests that he could have been reassigned to administrative tasks; specifically, writing tags for nonconforming parts, as he had done for part of his 2003–07 stint in sheet metal assembly.  But, as Plaintiff explained in his deposition, the task of tag writing was no longer part of quality assurance in sheet metal assembly.  The inspection department took over that work in 2007, around the time Plaintiff moved from sheet metal assembly to inspection.  Therefore, in order to perform the administrative task of tag writing in 2010, Plaintiff would have required a transfer to the inspection department—a department in which he lacked the seniority he held in sheet metal assembly.

The Tenth Circuit has explained:

> Employers have a duty to reassign, but only when it is reasonable under the circumstances. Typically, this means employers are only required to reassign employees to existing vacant positions.  A position is vacant when a similarly situated, non-disabled employee would be able to apply for it.  And while employers need not promote an employee when they reassign him, they are required to consider only lateral transfers or, if none are available, demotions.  Koessel bears the burden of identifying a specific vacant position to which he could have reasonably been reassigned.[77]

Plaintiff has presented no evidence of a vacant position as an inspector that was available to him or any other similarly situated non-disabled employee after the August 2010 RIF.  Due to his lack of seniority, he was not in a position to transfer to that department, and an accommodation is generally not considered reasonable if it conflicts with a collectively bargained-for seniority system.[78]  Special circumstances might justify a departure from this general rule when it can be

---

[77]*Koessel*, 717 F.3d at 745 (citations omitted).

[78]*See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 399–400 (2002); *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1232 (10th Cir. 2009).

shown that the requested accommodation is reasonable.[79]  Examples of such circumstances provided by the Supreme Court include when the employer retains the right to change the seniority system and does so frequently, or when the system contains so many exceptions that one further exception would unlikely matter.[80]  Plaintiff has failed to meet his burden of showing that special circumstances warranted HBC making an exception to the collective bargaining agreement seniority system by transferring Plaintiff to the inspection department.[81]  While he asserts that the collective bargaining agreement contains exceptions, he does not explain what they are or how they are applied.  Moreover, Plaintiff's argument that HBC accommodated him several years prior by assigning him to administrative tasks is unavailing given his testimony that these tasks were moved to the inspection department where he lacked seniority.  Plaintiff cannot therefore meet his burden of demonstrating that reassignment was a facially reasonable accommodation.

In sum, the Court finds that Plaintiff is unable to establish a genuine issue of material fact about whether he sought reasonable accommodations to performing the essential functions of his job as a sheet metal assembler.  Many of the accommodations sought by Plaintiff were either met by Defendant, or provided in a more cost effective manner.  Others were either facially unreasonable or would have caused Defendant an undue hardship.  Accordingly, summary judgment is warranted in favor of Defendant and against Plaintiff on Plaintiff's claims of discrimination on the basis of its failure to accommodate.

---

[79]*Barnett*, 535 U.S. at 405.

[80]*Id.*

[81]*Id.* ("plaintiff must bear the burden of showing special circumstances that make an exception from the seniority system reasonable in the particular case").

2.      **Discharge**

As with Plaintiff's failure to accommodate claim, Plaintiff is required on his unlawful discharge claim to show that he was qualified to perform the essential functions of his job with or without reasonable accommodation.  As explained above, Defendant has pointed to an absence of evidence that would support Plaintiff's claim that he was qualified to perform his job with reasonable accommodation, so Plaintiff's termination claim must also fail because he cannot prove the elements of a prima facie case of discrimination.

Moreover, Plaintiff cannot show that he was discharged.  In order to succeed on his unlawful discharge claim, Plaintiff must be able to show that his retirement was involuntary.[82] The fact that Plaintiff was presented with "'two unpleasant alternatives does not make the resulting action involuntary.'"[83] Plaintiff contends that he was given an ultimatum: either work as a sheet metal assembler without the requested reasonable accommodations, or accept disability retirement.  But as described above, Plaintiff has not met his burden of showing that he requested facially reasonable accommodations that Defendant either did not meet, or for which Defendant has shown would cause an undue burden.  The only accommodation substantiated by Dr. Goertz—polycarbonate protective eyewear— was already provided by Defendant to its employees.  And the record does not indicate that Plaintiff ever presented Defendant with documentation of this work restriction.

Moreover, Plaintiff cannot point to record evidence that his retirement was involuntary.

---

[82]*Emerson v. Widnall*, 104 F.3d 367 (10th Cir. 1996) (unpublished table decision); *Wall v. United States*, 871 F.2d 1540, 1543 (10th Cir. 1989).

[83]*Areneson v. Heckler*, 879 F.2d 393, 396 (8th Cir. 1989) (quoting *Taylor v. United States*, 591 F.2d 688, 690 (Cl. Ct. 1979)).

In applying for Social Security and disability retirement benefits, Plaintiff represented that he would be unable to work for the remainder of his life.  And the uncontroverted facts establish that after Plaintiff filed his amended administrative complaint, Defendant offered to have its third-party administrator rescind the retirement disability benefit if Plaintiff did not wish to proceed with those benefits.  Plaintiff declined the offer.  Defendant has pointed to a lack of evidence to support Plaintiff's claim that his retirement was involuntary.  Plaintiff conclusory assertions otherwise do not support a claim that he was involuntarily discharged.

### 3.     Failure to Hire

Finally, Plaintiff alleges in the Pretrial Order that he was discriminated against when HBC cancelled his interview for  a Technical Specialist position in February 2011.  Plaintiff alleges that the interview was canceled after the selection coordinator learned of Plaintiff's disability and medical leave status.  But it is uncontroverted that <u>none</u> of the applicants for the Technical Specialist position were interviewed or hired because HBC learned that a previously laid off worker who had previously performed the job was working for HBC as a contractor.  HBC hired this worker with previous experience and cancelled all scheduled interviews for the position.  Plaintiff has come forward with no evidence to suggest that this legitimate, nondiscriminatory reason for failing to hire Plaintiff for this position is unworthy of belief.  Indeed, he can point to no similarly situated non-disabled individuals who did not have their interviews cancelled.  Accordingly, summary judgment is appropriate on this claim.

### C.     Retaliation Claims

The elements of a prima facie claim of retaliation under the ADA are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse action

during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[84]

### 1.      Protected Opposition to Discrimination

Defendant does not dispute that Plaintiff engaged in protected activity by filing his administrative claims with the KHRC.  Plaintiff's retaliation claims also allege that he was retaliated against for seeking reasonable accommodations.  A request for reasonable accommodation is protected activity under the ADA.[85]  As described above, his claim that he was retaliated against for requesting accommodations in November 2009 is not actionable because it was not timely exhausted.  However, Plaintiff also claims he was retaliated against after he sought accommodations in August 2010, when HBC placed him on an involuntary medical leave of absence.  This claim was timely exhausted.

### 2.      Adverse Action

The "materially adverse" action element of a retaliation claim is more lenient than the "adverse employment action" element of discrimination claims.[86]  In the context of a retaliation claim, Title VII prohibits an employer from taking "materially adverse" action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity.[87]  "[A] plaintiff must show that a reasonable employee

---

[84]*Proctor v. UPS*, 502 F.3d 1200, 1208 (10th Cir. 2007).

[85]*Wehrley v. Am. Family Mut. Ins. Co.*, 513 F. App'x 733, 740 (10th Cir. 2013).

[86]*See Piercy v. Maketa*, 480 F.3d 1192, 1203 n.12 (10th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

[87]*Burlington*, 548 U.S. at 63.

would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[88]  The court examines claims of adverse action through a "case-by-case approach, examining the unique factors relevant to the situation at hand."[89]  The materiality of a claimed adverse action is to be determined objectively; "petty slights, minor annoyances, and simple lack of good manners" will not deter "a reasonable worker from making or supporting a charge of discrimination."[90]  The Tenth Circuit has emphasized that deciding whether an employer's actions are "materially adverse" is a case-specific exercise that requires an objective inquiry that does not turn on a plaintiff's personal feelings.[91]  In making a decision, the court is obliged to consider the "'constellation of surrounding circumstances, expectations and relationships.'"[92]

Plaintiff alleges that Defendant took materially adverse actions by causing his involuntary retirement and by placing him on involuntary medical leave in September 2010.  He argues that Defendant took other retaliatory measures against him such as conducting "intimidating meetings" with him, refusing to communicate with his optometrist, assigning him to janitorial duties, subjecting him to verbal abuse and insults, harassing him for staying late when he was waiting for transportation, giving him ultimatums regarding returning to work or

---

[88]*Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (quoting *Burlington*, 548 U.S. at 67–68).

[89]*McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006).

[90]*Id.* (quoting *Burlington*, 548 U.S. at 68).

[91]*Semsroth v. City of Wichita*, 555 F.3d 1182, 1184–85 (10th Cir. 2009).

[92]*Barone v. United Airlines, Inc.*, 355 F. App'x 169, 183 (10th Cir. 2009) (quoting *Burlington*, 548 U.S. at 69).

being subject to termination, and altering his termination date by three weeks.[93]

As stated in the Court's analysis of the discrimination claim, a reasonable jury could not determine that Plaintiff was terminated from his position as a sheet metal assembler.  Instead, the record demonstrates that he voluntarily retired after his request for accommodation was partially denied.  Therefore, there is no genuine issue of material fact that his retirement was not an adverse employment action.

The Court is unable to conclude that conducting "intimidating meetings," assigning him to janitorial duties, subjecting him to verbal abuse and insults, and harassing him for staying late when he was waiting for transportation are materially adverse actions.  Instead, to the extent Plaintiff has any evidence to support this conduct, it falls into the category of "petty slights, minor annoyances, or simple lack of good manners."  Moreover, Plaintiff testified that this alleged conduct occurred in November 2009, so any claim based on this conduct would be untimely.  The Court is also mindful that Plaintiff continued to pursue his discrimination and retaliation claims despite this conduct, suggesting that it was not sufficient to dissuade a reasonable worker from supporting a charge of discrimination.[94]

As to Plaintiff's assertion that HBC refused to communicate with his optometrist, he points to no evidence in support.  The record is replete with evidence that Plaintiff attempted,

---

[93]Plaintiff has submitted no evidence of janitorial assignment, refusal to communicate with his optometrist, intimidating meetings, or verbal abuse and insults.  He testified in his deposition about being singled out and questioned about why he was staying late past his shifts in order to wait for transportation.  The Court therefore need not consider these allegations of retaliation, referenced in the KHRC Complaint, but not included in this record.  Nonetheless, as described in this section, taking Plaintiff's conclusory assertions as true, they fail to support a prima facie case of retaliation under the ADA.

[94]*See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008) ("[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to whether the actions are sufficiently material and adverse to be actionable.").

without success, to obtain documentation from Dr. Goertz that he was prohibited from working in sheet metal assembly.  Dr. Goertz declined to go so far as to say that Plaintiff could not work in sheet metal assembly; the closest restriction she provided in writing was that he must protect his eyes and wear polycarbonate lenses.  Importantly, there is no evidence in the record that Plaintiff provided any of the letters he did obtain from Dr. Goertz to HBC.

The Court does find that a reasonable jury could determine that placing Plaintiff on involuntary medical leave would dissuade a reasonable employee from making or supporting a charge of discrimination.  While the evidence on this point is slight, given that Plaintiff proceeded to file a charge of discrimination despite this action, it is undisputed that this medical leave was involuntary.

### 3.    Causal Connection

The Tenth Circuit has found a causal connection exists between the protected activity and the materially adverse action "where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive."[95]  Courts typically consider "protected conduct *closely followed by* adverse action" as sufficient evidence.[96]  However, when sufficient time has elapsed between the protected conduct and the adverse action, a court requires "additional evidence beyond temporal proximity to establish causation."[97]

When analyzing the additional evidence, the court can consider all the proffered evidence

---

[95]*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[96]*Id.* (emphasis added).

[97]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *see e.g., Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding one and one-half months establishes causation while three months is too long and does not).

of retaliatory motive, which includes pretext evidence.[98]  "In order to make a prima facie case,

one must only introduce evidence from which an inference can be drawn that an employer would

not have taken the adverse action had the employee not filed prior discrimination charges."[99]

Ultimately, the burden of establishing a prima facie case is not onerous, but "[t]o defeat a motion

for summary judgment, evidence, including testimony, must be based on more than mere

speculation, conjecture, or surmise."[100]  The Supreme Court has recently clarified that a Title VII

plaintiff asserting a claim of retaliation must show that his protected activity was the but-for cause

of the alleged adverse employment action, and not merely a motivating factor.[101]  The ADA uses

similar "because" language, and the Tenth Circuit has consistently applied the Title VII

framework to ADA retaliation claims.[102]

 Other than discharge, Plaintiff claims retaliation in the form of conducting "intimidating

---

[98]*Xia v. Salazar*, 503 F. App'x 577, 580 (10th Cir. 2012) (citing *Anderson*, 181 F.3d at 1179).

[99]*Tex. Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)

[100]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (affirming grant of summary judgment to employer because "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings.").

[101]*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

[102]42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter.").  Although the Tenth Circuit has not had the opportunity to apply the but-for causation standard to ADA retaliation claims, lower courts have reasoned that because ADA retaliation claims are analyzed under the same framework as Title VII retaliation claims, the *Nassar* but-for standard applies outside the context of Title VII.  *See Purcell v. Am. Legion*, 44 F. Supp. 3d 1051, 1057 (E.D. Wash. 2014); *Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.*, No. 12-cv-00817-RLY-DML, 2014 WL 3942362, at *1 (S.D. Ind. Aug. 12, 2014); *Hutchins v. DirecTV Customer Serv., Inc.*, No. 11-CV-422-REB, 2014 WL 3572045, at *12 (D. Idaho July 21, 2014); *Carvajal v. Pride Indus., Inc.*, No. 10cv2319-GPC, 2014 WL 1921732, at *6 (S.D. Cal. May 14, 2014) (collecting cases); *Goodwin v. Wellstar Health Sys., Inc.*, No. 12-cv-3752-WSD, 2014 WL 1275593, at *4 n.8 (N.D. Ga. Mar. 27, 2014) (applying "but-for" causation standard to ADA claim because it includes "because" language similar to Title VII); *Brooks v. Capistrano Unified Sch. Dist.*, No. 12-01934-JLS, 2014 WL 794581, at *6 (C.D. Cal. Feb. 20, 2014) (applying "but-for" causation standard to ADA claim because ADA claims are subject to the same framework of analysis as that of Title VII claims).  *Cf. Melin v. Verizon Bus., Inc.*, No. 12-cv-2426-EFM,  2014 WL 978813, at *12 (D. Kan. Mar. 1, 2014) (holding that since plaintiff could not establish causation in ADA claim under the more minimal standard, it stood to reason he could not maintain causation under the heightened standard in *Nassar*).

meetings" with him, assigning him to janitorial duties, subjecting him to verbal abuse and insults, and harassing him for staying late when he was waiting for transportation.  Plaintiff did not return to work at HBC after he was placed on medical leave in September 2010, so none of this conduct could have been the result of filing the administrative complaints in February 2011, August 2011, or September 2011.  To be sure, Plaintiff alleges that these retaliatory actions were in response to his November 2009 request for accommodation, which is a time-barred claim.

Plaintiff provides no evidence about when HBC allegedly refused to communicate with Dr. Goertz.  The only evidence in the record about Dr. Goertz communicating with HBC took place on May 21, 2010, when Dr. Goertz spoke with Plaintiff's supervisor Renee Cooper, who stated she had not received previous letters from Dr. Goertz and that she did not know why Plaintiff needed them because she did not oversee the sheet metal department.  This communication occurred before Plaintiff requested accommodation in August 2010, and well before his KHRC complaint was filed in February 2011.

Plaintiff sought accommodations for his visual impairment again in August 2010, and maintained that without his requested accommodations, he could not perform his job.  Within a few weeks, Plaintiff was placed on medical leave for approximately one year unless he provided documentation that he could work after all before that time period elapsed.  During part of this time Plaintiff obtained short term disability benefits.  The temporal proximity between Plaintiff's request for accommodations and his medical leave was a matter of weeks; sufficient to establish causation based on temporal proximity.

### 4.     Pretext

As stated above, the only retaliation claim for which Plaintiff has fulfilled his burden of

establishing a prima facie case is his claim that Defendant retaliated against him in September 2010 when it placed him on involuntary medical leave after he requested accommodations for his visual impairment.  Defendant maintains that it placed Plaintiff on medical leave in September 2010 because he was unable to work due to incapacity, consistent with company policy.  Because Defendant is able to articulate a legitimate nondiscriminatory reason for this employment action, the burden shifts to Plaintiff to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[103]

The uncontroverted facts show that Plaintiff asserted his inability to work in sheet metal assembly without accommodation.  Defendant partially accommodated Plaintiff's requests, however, it declined to provide several of his requested accommodations based on undue burden or because it would violate the collective bargaining agreement.  Plaintiff was told that he could return to work, stay on medical leave, or initiate the disability retirement process.  Although Plaintiff characterizes these options as an ultimatum, he fails to explain why they are untrue statements of his options or why Defendant's explanation for its action is unworthy of belief.  As discussed on the discrimination claims, no reasonable factfinder could conclude that Defendant denied Plaintiff's request for reasonable accommodations and it is undisputed that Plaintiff could not perform the essential functions of his job without such accommodation.  Moreover, it is uncontroverted that reassigning Plaintiff to an administrative position would have violated the collective bargaining agreement and it was therefore not an option after the August 2010 RIF. Although Plaintiff argues that similarly situated non-disabled employees were given favorable

---

[103] *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1052 (10th Cir. 2011) (citation and quotation marks omitted).

reassignments for which they lacked seniority, he fails to come forward with evidence that would be admissible at trial to support this contention.  Plaintiff's own testimony on this point would be inadmissible for lack personal knowledge about the seniority and qualifications of these other employees.  In sum, summary judgment is granted in favor of Defendant on all retaliation claims.

## VI.    Conclusion

Plaintiff's cross-motion for summary judgment must be denied, even if it had been timely filed.  Because Plaintiff bears the ultimate burden of persuasion on his claims of discrimination and retaliation, he was required to establish as a matter of law all essential elements of his claims. He has not met that burden.  Defendant, as the party who does not bear the ultimate burden of persuasion in this case, has met its summary judgment burden of demonstrating a lack of evidence that would produce a genuine issue of material fact on any of the essential elements of Plaintiff's claims.  Plaintiff is unable to show, with the support of record evidence, that he was willing to perform the essential functions of his job with or without reasonable accommodations.  Plaintiff's claims of discrimination thus fail.

Plaintiff's retaliation claims also fall short.  While he certainly engaged in protected activity by filing an administrative charge of discrimination and by requesting reasonable accommodations, he could not show that HBC took materially adverse actions against him because of these protected activities.  Nor could Plaintiff point to evidence that Defendant's legitimate, nonretaliatory explanation for his involuntary medical leave was unworthy of belief.

Because there are no genuine issues of material fact to support Plaintiff's discrimination and retaliation claims in this case, his favorable rulings from the KHRC and EEOC will not suffice to create triable issues of fact and summary judgment is granted in favor of Defendant on

all claims.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for

Summary Judgment (Doc. 147) is **granted**, and Plaintiff's Cross-Motion for Summary Judgment

(Doc. 153) is **denied**.

**IT IS FURTHER ORDERED BY THE COURT** that Plaintiff's Motion for Leave to

File Sur-Reply (Doc. 162) is **moot** and Plaintiff's Amended Motion for Leave to File Sur-Reply

(Doc. 163) is **granted**.  Defendant's Motion to Strike Plaintiff's Response to Defendant's Reply

to Defendant's Motion for Summary Judgment (Doc. 167) is **denied**.

Dated:  May 26, 2015

       S/ Julie A. Robinson
      JULIE A. ROBINSON
      UNITED STATES DISTRICT JUDGE